UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH CARMICHAEL | |
| *Plaintiff*, | Civil No. 3:19cv908 (JBA) |
| *v.* | February 24, 2021 |
| ADVANCED NURSING & REHABILITATION CENTER OF NEW HAVEN, LLC AND ADVANCED CENTER FOR NURSING & REHABILITATION, LLC | |
| *Defendants*. | |

**MEMORANDUM OF DECISION AND ORDER**

### I.      Introduction

Plaintiff Deborah Carmichael brings a claim of associational disability discrimination under the Americans with Disability Act, 42 U.S.C. § 12101, against Defendants Advanced Nursing and Rehabilitation Center of New Haven, LLC and Advanced Center for Nursing & Rehabilitation, LLC (jointly "Advanced") for terminating her employment as a Licensed Practical Nurse  ("LPN") because of her association with her fourteen-year-old son, who had become severely disabled in an accident four months earlier. Advanced denies that her discharge violated the ADA and was instead performance-based. A three-day remote bench trial was held on September 8-10, 2020, hosted from the Federal Courthouse in New Haven, CT.  The Court's findings of fact and conclusions of law follow.

### II.      Background

#### a.  Before Plaintiff's Son's Accident

Advanced, a private skilled nursing facility in New Haven, CT located across from Yale New Haven Hospital, was subject to an improvement plan in 2016 to remedy deficiencies found in a survey by the Connecticut Department of Health and the Centers for Medicare Services that placed the institution in immediate jeopardy for termination of eligibility for

Medicare reimbursements. New leadership took over in early 2017, with Marley West, the new Director of Nursing, working alongside Pat King, a consultant who later became Interim Administrator of the facility in March of 2017. In descending order of authority below King and West were Assistant Director of Nursing Michelle Morse and the nursing management team, comprised of Registered Nurses ("RN"s), Licensed Practical Nurses ("LPN"s), most of whom served as "charge nurses," and certified nurse assistants ("CNA"s). At all times, there was one RN present at the facility who supervised the charge nurses who were assigned to each of the building's six units where they administered medications and managed the CNAs. At the change of each shift, the outgoing charge nurse would "count the cart" with the incoming charge nurse, ensuring that all the medications were properly accounted for, before transferring the medication cart key to the incoming charge nurse.

At the time of Plaintiff's termination, Advanced was undergoing a complete system overhaul. West had been hired, in her own words, as a "turnaround" director to deal with the many deficits that had been documented by the Department of Health. (Trial Transcript at 234.) Just one week after West began her position in late February 2017, there was an electrical emergency in the building that required all residents to be transferred to alternative housing situations until the building could be repaired.  West, along with King, oversaw the evacuation and subsequent reintroduction of patients throughout the month of March in 2017.

West recalled that the unionized staff were initially resistant to her leadership, making the facility "challenging" to turnround. (*Id.* at 239.) West's recurrent instructions to her nurses were to never leave a patient alone and where there is a problem: "if you see it, you own it because if you leave it, you're neglecting it and consequences will be handed out accordingly." (*Id.* at 75-76.)

Five months before West's appointment as Director of Nursing, Plaintiff Deborah Carmichael began working as an LPN and charge nurse at Advanced in October of 2016. Prior

to her job at Advanced, she had been a CNA for about three years, and Advanced was her second employment position after her graduation from nursing school. She was a single mother with no family in the area, relying primarily on her son's godfather if childcare support was needed. At her six-month mark at Advanced, she earned "average" and "above average" marks on her performance evaluation which was completed in late March 2017. (Pl.'s Exhibit 2). West described Plaintiff as a "good nurse," personable with her patients and reliable. (Tr. at 253.) Plaintiff never asked for time off, even after her son's accident, and was never late nor missed a shift.

### b. Son's Accident

On April 29, 2017, Plaintiff's fourteen-year old son was hit by a motorcycle while riding his bike and was immediately rushed to Yale New Haven Hospital to undergo emergency brain surgery. Plaintiff received the initial call from the Hospital while she was at work at Advanced. Plaintiff immediately informed her supervisor that her son had been hit by a car while biking and that she needed to go to the Hospital. Her supervisor contacted both Marley West, Director of Nursing, and the nursing home's scheduler to find a replacement for the rest of Plaintiff's shift. After twenty minutes or so, the supervisor informed Carmichael that West "didn't feel that [her son's situation] was that serious at this time" and directed that Plaintiff was not to leave without a replacement because the supervisor was unable to dispense medications to Plaintiff's patients. (*Id.* at 42.) Plaintiff remained at the nursing facility until she received another call from the Hospital informing her that surgery would begin imminently. At that point, Plaintiff handed the medical cart keys to her supervisor and ran across the street to be with her son.

After the surgery, Plaintiff spoke with the scheduler, who, without request from Plaintiff, had already pulled her from the weekend shifts. Around this time, Carmichael received a phone call from West asking her "what [she] plan[ned] to do to keep [her] job." (*Id.* at 45.) Plaintiff recalled being shocked and confused by the question since she was a

single mother with no alternative income. Plaintiff testified she told West she did not plan to leave her position and that she did not foresee her son's condition as being problematic for her job. (*Id.* at 45.) After Carmichael confirmed her intent to continue working at Advanced, West ended the call and Plaintiff returned to work her normal shifts while her son remained in the hospital in a medically-induced coma.

### c. License Renewal

Shortly after the accident, Carmichael began receiving texts and calls from the Human Resources department at Advanced reminding her to renew her LPN license. Both West and King testified that Advanced did not, and still does not, have its own formal written or verbal policy about the timing of license renewal. The State of Connecticut requires LPNs to renew their licenses each year on their birthdays by paying a small fee online, but provides a ninety-day grace period before a license is officially deemed expired.[1] Plaintiff testified that other nurses took advantage of the grace period for license renewal without any adverse consequences, specifically recalling that Jessica Kiddman, another LPN who worked at Advanced, was faced with a sick family member during the period in which she needed to renew her license and was "given extra time and other privileges to be able to handle her affairs." (*Id.* at 48.) Plaintiff's license renewal date was at the end of May, giving her until the end of August to renew before losing her nursing license. She spoke with both HR and West to request additional time to renew her license because her son was set to be released from the hospital around the time that the renewal was due. Though West admitted at trial that she was aware of Plaintiff's request for more time and the grace period afforded by the state, (*id.* at 286-88), Advanced took Plaintiff off the schedule for two days in early July 2017 for failing to immediately renew her license, despite there being no internal policy warning of such consequence.

---

[1] *See* CONN. GEN. STAT. § 19a-88.

### d. Suspension After Bringing Son to Work

Prior to Plaintiff's son's release from the rehabilitation hospital and in anticipation of his need for 24-hour care, Plaintiff spoke with the Assistant Director of Nursing Michelle Morse about Advanced's policies regarding bringing children to work in case of an emergency. Morse was unclear about the policy but promised to "pull a meeting in, get everyone together, discuss it and get back to [Plaintiff]." (*Id.* at 51.) Plaintiff testified that she had seen, on at least two occasions, other nurses bring their children to work, naming Samantha and Theresa as two LPNs who had their children accompany them to Advanced when their childcare had fallen through. (*Id.* at 52-53.) Plaintiff never heard back from Morse, so she presumed that she was permitted to bring her son under such circumstances, given that she had seen other nurses do so without negative consequences. She assumed this leniency would apply for her as well.

On July 10, 2017, Plaintiff's son's godfather, who had been providing care while Plaintiff was at work, was late returning from his shift at the train station, so Plaintiff had to bring her son to work in order to not be late and where he would be supervised until his godfather could pick him up. Other than her prior inquiry, Plaintiff did not request permission to bring her son with her that day. When she and her son took the elevator with Blossom, a supervisor on a different floor, Blossom showed no negative reaction. Plaintiff testified that Blossom

> didn't say nothing. She didn't even seem shocked. She just, okay, and kept going, acknowledged him, you know, nice to meet him and kept going. . . . She, [] you know, introduced herself and kept going, smiled and kept going. There was no shock. She didn't send me to see another supervisor or the director of nursing. We just carried on like a normal day.

(*Id.* at 60.)

Plaintiff put her son, who, at that point after the accident only had the mental capacity of a four- or five- year-old child, in an unoccupied resident room nearby to play with his

phone while she worked. A couple hours later, while Plaintiff was passing out medications to her patients, Patricia King and Michelle Morse entered the wing to do rounds. King saw Plaintiff's son in the unoccupied room and asked him what he was doing, to which he responded, "I am with her passing meds." (Defs.' Ex. B (King's Report) at 8.) King also noted that the door to the medication room was open and asked Plaintiff why the door was ajar. Plaintiff apologized and moved to close the door.

King next told Plaintiff to move into the back room to discuss the open medication room door, and a union delegate and two supervisors were called to attend the meeting. From that point on, Plaintiff and King present starkly different versions of what happened. In her reporting of the incident, King described Plaintiff as an erratic, out-of-control employee:

> [S]he began to yell while at the med cart in the resident hall with resident's [sic] around, that she had no one to watch her son. She began to escalate out of control and we could not even get a word in to calm her. I asked her to close the med cart and step away to speak with us and she kept screaming while in the resident hall. She continued to speak loudly and said that was her son and he cannot be left alone. I tried to explain to her that, I hadn't even discussed that with her yet, however, she was uncontrollable at that time and erratic. We tried numerous times to tell her to stop passing medications, as we were concerned about her state of behavior and after passing 2 more further [sic] resident medications, including an insulin, she then said she is leaving with her son. She began to grab her bag and leave. I told her if she left without discussing this situation it would be considered abandonment of her patients and insubordination. She had her bag and said, "when will the supervisor be there'? [sic] [Assistant Director of Nursing Services] said, she could not say exactly when. [sic] At that point, I called the two supervisors to come to the unit and bring the delegate.

(Defs.' Ex. B (King's Report) at 8.)   In contrast, in her reporting, Plaintiff described an intransigent, unreasonable management:

> Pat told me my son had to go. I replied to Pat that I would lock my cart and go home immediately. Then Pat accused me of abandoning my patients. I replied to Pat that I was doing what she said. If my son could not be there th[e]n I had to go. During this conversation, I continued to try to finish first med-pass because I didn't want to leave a load for the nurse that would have to take over. I was told by Michelle [Morse], in a very rude voice, "stop passing meds, lock the cart and step off my unit." I replied, "no

problem, where would you like for me to go.? [sic]" Pat told me I needed to wait for a
supervisor and Delegate, I waited at the nurses' station.

(Defs.' Ex. B (Carmichael's Report) at 7.) At trial, both Carmichael and King confirmed their
divergent accounts, with Plaintiff acknowledging that she had administered insulin after
being told to close the cart because "[b]y law, I cannot leave medications unattended, and
once the medication has been prepped, it must be given within its allotted time.  [B]ecause
the insulin pen was already out of the refrigerator and prepped for me to give, I did give that
pen because I can't leave it." (Tr. at 64.) King reasserted how "out-of-control" and "erratic"
Carmichael acted and described her concern that patients could be impacted if Plaintiff
administered medication while in an agitated state.

 After the two supervisors and union delegate arrived, the reports of what happened
continued to diverge. Plaintiff recalled in her written report of the incident:

> Jean, Union Delegate for Nursing, Shift Supervisors, Blossom, Lydia, Pat King and
> Michelle decided to talk in the break room on D3. During this conversation, I was
> trying to inform Pat King that I came in on June 13 and spoke to Michelle informing
> her my son was 24 hour supervised care due to a traumatic brain injury.  I was seeking
> advice as to how to prevent this type of situation.
>
> Michelle yells out "everyone is aware of your situation Deborah" . [sic] While trying
> to explain, Michelle kept yelling over me saying "We told you he could not come into
> the building" [sic] I told Michelle that was not true, and that I would tell the truth
> whether she liked it or not.
>
> Michelle then stepped directly into my face and rolled her neck. I refused to
> acknowledge how close Michelle was into my personal space. It was very
> unprofessional and I felt threatened by her body language and gesture. No one in the
> room said anything to her, or tried to redirect her behavior. To end this meeting I
> asked Pat, what did she want me to do? Pat King told the Shift Supervisors to count
> with me and take the cart keys.

(Defs.' Ex. B (Carmichael's Report) at 7.) King wrote her account of the same encounter:

> They arrive and we were able to bring her into the pantry with ADNS, [] Delegate[,]
> and two supervisors. . . . She proceeded to further escalate whereby, no one could get
> a word in even after reminding her it was abandonment of patients and
> insubordination if she did not listen to us.

(Defs.' Ex. B (King's Report) at 8.) In her trial testimony, King confirmed that Morse said to Plaintiff, "[W]e all know about your situation, Deborah, we all know about your son." (Tr. at 154.)

In addition to King and Carmichael, both the shift supervisors, the union delegate, and Morse filled out incident reports. Morse described Plaintiff's demeanor as "highly agitated waving her finger in my face yelling that 'she asked permission and no one called her back' [and] adding that 'he has staples in his head and needed 24 hour supervision.'" (Defs.' Ex. B (Morse's Report) at 9.) Morse further described Plaintiff as "very loud, hostile and highly overemotional, her hands were visibly shaking and her behaviors continued to escalate," stating that Carmichael "slam[med] her cart closed" while "yell[ing] that we were unreasonable and uncompassionate and that she would take her son and leave now" and that Plaintiff "erratically yell[ed] about not being allowed to have her son at work, [and was] inappropriate and insubordinate not letting any other person speak with out [sic] interruption." (King's Report at 9.) In her report, Morse did not mention her comments about Plaintiff's son.

The shift supervisors' and the union delegate's reports begin after they were called to join the impromptu meeting to deal with the presence of Plaintiff's son. Though they describe that Plaintiff was "loudly talking" and "became very loud and upset," none of the reports mention either Plaintiff's administration of insulin or the open medication room door.  All three reports document the argument over the presence of Plaintiff's son. (Defs.' Ex. B (Observers' Reports) at 6, 12-14.) Notably, while King's report states that Plaintiff "was informed by the delegate that no one is to bring their children to work," neither the

delegate's, nor the supervisors', nor Plaintiff's reports from the incident corroborate that aspect. (*Id.* at 8.)

In response to this incident, Plaintiff was suspended for her "violation of company policies/procedures" and "unsatisfactory performance." (Defs.' Ex. B (Incident Report Form) at 2-3.) On July 18th, she was called into a meeting with King, Marley West, and a new union delegate to sign documentation describing the incident and to be "educate[d]" on the expectations of her position. (Tr. at 133.) Plaintiff was allowed to return to work after receiving a "final" warning from West warning Plaintiff that any further incidents would result in her termination. (*Id.* at 289.)

### e.  Termination

Barely a month later, on August 21, 2017, Plaintiff was closing out her shift by filling out paperwork at the nurses' desk, when Helen Nzekwe, the charge nurse taking over from her, and Mary, a CNA, called out that a resident had fallen in her room. From her vantage point at the desk, Plaintiff testified that she was unable to see the patient and did not approach because both Nzekwe and Mary were with the patient.  Following Advanced's protocol, Plaintiff alerted the RN on duty, Ruth Casulla, that a resident had fallen. Plaintiff testified that she then went into the back room to retrieve the paperwork that would be needed to document the incident and instructed the CNAs who were in the room to help Nzekwe and Mary with the fallen patient.  Plaintiff testified that when she returned to the desk, Helen had left the patient alone and had come to stand at the nurses' desk with Plaintiff.

When Ruth Casulla, the RN who responded to Carmichael's alert, saw Plaintiff at the desk, she reportedly exclaimed, "How come you are not with the patient right now? You called me and you are not attending to the patient who was on the floor," to which Plaintiff responded, "Marley told me that I was to be out by 11:15 pm." (Defs.' Ex. F (Staff Statement Form) at 2.) In her incident report, Casulla wrote that she said, "'Deb, this is your priority as

patient safety and you are responsible for their safe care.' your negligence is not acceptable, period!!!! The rest is history." (*Id.*)

Plaintiff did not inform Casulla that Nzekwe had been the one to find the fallen patient. However, Plaintiff testified that after the patient had been properly attended to, she asked Casulla if she should fill out a statement about the incident, and Casulla waved her off, stating that Nzekwe would deal with the paperwork. Early that morning, both Casulla and Nzekwe filled out incident reports detailing the sequence of events.  In her report dated August 22nd at 4:25 AM, Nzekwe wrote, "Writer was walking down the hallway at the beginning of shift, (10:55pm) pt was observed sitting on the floor."[2] (Defs.' Ex. G (Incident Report) at 10.) Casulla testified that she reviewed Nzekwe's report "[t]hat same night that I wrote because I always read their notes," and "[a]fter I read it, then I realized" that Nzekwe had found the fallen patient. (Tr. at 210-11.)

Later that morning around 8:00 AM, even though Casulla had determined that Nzekwe had found the patient, Casulla testified she approached West with her concerns about Plaintiff's actions. West then reviewed all the statements, including those by Nzekwe and Mary which explicitly stated that Nzekwe found the patient.  West took statements from both Casulla and Nzekwe, (Defs.' Ex. G (Incident Report) at 10 at 11, 12), but did not seek a statement from Plaintiff about the incident. While a union delegate's signature appears on the discharge form, no report or testimony indicates that a union delegate was involved before Plaintiff was discharged. (*See* Defs.' Ex. E (Discharge Form) at 3.)

The next day, Plaintiff was informed by West's voicemail that she had been terminated. The Discharge Form stated:

---

[2] The staff statements confirmed that Nzekwe had been the first to see the patient. One of the CNAs on duty stated that "at 10:54 pm I saw Resident sitting on chair quietly in her room.[sic] and the 11-7 nurse [Helen] behind me coming on the floor [said] that the resident is on the floor." (Defs.' Ex. G (Incident Report) at 6.)

> Resident (RL) fell in her room. Charge nurse left resident unattended on the floor and
> returned to the nurses' station.  When addressed by the Supervisor the nurse stated
> "Marley told me that I have to be out by 11:15 pm."

(Defs.' Ex. E (Discharge Form) at 3.) Though Plaintiff attempted to meet with West and a

union delegate to discuss the grounds for termination and a pathway forward, West refused

to speak with her. Nzekwe, despite finding and leaving the patient, received no punitive

consequences for her conduct.

After being fired from Advanced, Plaintiff spent ten months searching for a new job

as an LPN, finally securing one at another nursing rehabilitation facility, the Willows, in June

of 2018. She seeks damages for net lost wages from September of 2017 through the end of

2019 totaling $28,198.38. Plaintiff further seeks compensatory damages for the emotional

harm she endured as a result of Advanced's treatment.

## III.    Discussion

To prove a claim for associational discrimination under the ADA, a plaintiff must

show: 1) that she was qualified for the job at the time of the adverse employment action; 2)

that she was subjected to adverse employment action; 3) that she was known at the time to

have a relative or associate with a disability; and 4) that the adverse employment action

occurred under circumstances raising a reasonable inference that the disability of the

relative or associate was a determining factor in the employer's decision. *Kelleher v. Fred A.*

*Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) (citing *Graziadio v. Culinary Inst. of Am.*, 817 F.3d

415, 432 (2d Cir. 2016)). It was undisputed that Carmichael was qualified to do her job,[3] was

subjected to adverse employment action when she was fired, and that she was known at the

---

[3] The ADA defines "qualified individual" as "an individual with a disability." 42 U.S.C. §
12112(b)(4). Because a claimant alleging associational discrimination does not herself
have a disability, the phrase "qualified individual" as applied in this context means
"qualified" in the colloquial sense – that is "simply [] qualified to do one's job." *Larimer*, 370
F.3d at 700.

time to have a relative with a disability.  The element in dispute at trial was whether she was fired because of her association with her disabled son.

There are three recognized categories of evidence which may demonstrate an employer's associational discrimination: "expense, disability by association, [or] distraction."[4] *Larimer v. International Business Machines Corp.*, 370 F.3d 698, 700 (7th Cir. 2004). Since neither Carmichael nor her son received medical benefits from Advanced, the increased expense category of discrimination is not in play. Discrimination "by association" is also inapplicable given that Carmichael's son's disability was a traumatic brain injury, not some contagious condition. Carmichael argues that Advanced fired her because they were concerned that she would be distracted by the serious condition of her disabled son and thus risked providing inattentive or inadequate care for the patients at Advanced. *See Kelleher*, 939 F.3d at 468; *Graziado*, 818 F.3d at 432.

Under the *McDonnnell-Douglas* burden shifting framework, once Plaintiff establishes a presumption of discrimination by making a *de minimus* showing of discriminatory intent, the burden shifts to Advanced to set forth a legitimate non-discriminatory basis for its adverse action, *see Kelleher*, 939 F.3d at 468; *Rosenberg v. Chesapeake Pharm. & Health Care Packaging*, 888 F. Supp. 2d 302, 309 (E.D.N.Y. 2012), after which the plaintiff may demonstrate that defendant's proffered reason is pretextual, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005), and that the defendant intentionally discriminated against her because of her son's disabled condition, *see Reeves*, 530 U.S. at 143.

---

[4] Under the ADA, only qualified individuals *with disabilities* are statutorily entitled to accommodations, so employers are not required to reasonably accommodate employees who have disabled relatives. *Kelleher*, 939 F.3d at 469 ("The issue of qualification arises nevertheless because of Kelleher's request for accommodation, which the ADA does not mandate employers to provide in this context."); *see also Larimer*, 370 F.3d at 700 ("[T]he right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.").

It is undisputed that Plaintiff has met her *prima facie* burden,[5] and that Advanced met its burden of production of a nondiscriminatory reason for the firing.[6] Thus, Plaintiff must prove "that the legitimate reasons offered by the defendant [for Plaintiff's termination] were not its true reasons, but were a pretext for discrimination," and Plaintiff's association with her disabled son was a determining factor in Advanced's decision. *Reeves*, 530 U.S. at 143 (internal quotations omitted); *Kelleher*, 939 F.3d at 468.

    *a. Pretextual Justification for Termination*

On direct examination at trial, West testified about the reason for Plaintiff's termination:

> Q. And why did you make the decision to terminate Ms. Carmichael?
>
> A. After reviewing the incident that had occurred and based on her former discipline, she had reached the level of termination for that type of -- for -- she had reached a level of termination.
>
> Q. Okay.  And there -- what was the final incident that prompted the termination?
>
> A. The incident regarding the fall, the fall with that resident.

(Tr. at 267.) This unquestionably would be a legitimate, non-discriminatory reason to terminate a nurse—West considered the incident with the patient to be the second (and final) transgression of Plaintiff and terminated her for the safety of the residents. At the time she fired Plaintiff, West wrote that "Resident (RL) Fell in her room. Charge nurse [Carmichael] left resident unattended on the floor and returned to the nurses' station." (Defs.' Ex. E (Discharge Form) at 3.) However, by this point, West knew that Nzekwe, not Plaintiff, was the nurse who had found the fallen patient, had left her unattended, and had

---

[5] The trial evidence showed that, after six months of satisfactory performance, she was fired within four months of her son becoming disabled, that her final warning status was related to bringing her son to work, and that she was fired for leaving a patient unattended, when the culpable nurse experienced no repercussions.

[6] Advanced states that it fired Plaintiff because she left a fallen resident unattended.

instead returned to the nurses' station. In her testimony, West admitted that what she wrote on the personnel form was untrue:

> Q. However, in this document you wrote "resident fell in her room.  Charge nurse left resident unattended on the floor and returned to the nursing station."  That is a false statement, isn't it?
>
> A. Yes.

(Tr. at 301.)

In her testimony, Plaintiff recalled, and West confirmed, that "the only policy that [West] follows is if you see it, you own it because if you leave it, you're neglecting it and consequences will be handed out accordingly.  That is the policy [] and that is what we follow." (*Id.* at 75-76, 305.) Yet, when Nzekwe violated this policy by leaving unattended the fallen patient she found, she received no discipline. When West interviewed Nzekwe about the incident, West did not mention Nzekwe's finding and then leaving the fallen patient. (*See* Defs.' Ex. G (Incident Report) at 12.) Only Plaintiff, who did not in fact violate West's rule because she never saw the fallen resident, was punished. While the official discharge paperwork notes that Plaintiff was fired for "Violation of Company Policies/Procedures," (*see* Defs.' Ex. E (Discharge Form) at 3), when pressed at trial to identify which policy Plaintiff had violated, West stated only that Plaintiff should have gotten up and checked on the resident, without acknowledging that Plaintiff had followed protocol by alerting the RN on duty that a patient had fallen. (*See* Casulla's trial testimony, Tr. at 292 ("That's -- they have to call any -- any charge nurse on that shift, designated shift, 7 to 3, 3 to 11 or 11 to 7, any charge nurse should call or shall call the supervisor if anything changes in the condition of the patient, any changes, whether it's the fall, any changes.").) In addition, though King had called a union delegate for the July incident with Plaintiff's son, West contacted no one from the union before discharging Plaintiff, by voicemail, appearing to wish to get rid of Plaintiff as quickly and quietly as possible. In light of the admitted falsity in describing Plaintiff's

14

actions, Defendant's justifications were "unworthy of credence" as the true reasons for terminating Plaintiff, and the Court must determine if this falsehood, in combination with all the evidence offered, supports a reasonable conclusion that discriminatory intent was a determinative reason for the firing.[7] *Reeves*, 530 U.S. at 147.

### b. Evidence of Discrimination

"Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence," but "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination," and the factfinder may "infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)). In fact, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation." *Id.*

Even if the defendant's explanation was pretextual, an employer could still prevail if the evidence conclusively revealed that the pretext was given to cover up "some other, nondiscriminatory reason for the employer's decision," or "there was abundant and

---

[7] In addition to the false discharge reason, Advanced's termination paperwork raises suspicions. Both the "Statement taken from Ruth Casulla by Marley West" and the "Statement taken from H. Nzekwe" ostensibly transcribe the contents of interviews, but, unlike the rest of Advanced's formal paperwork that is handwritten, dated correctly, and on Advanced letterhead, both "Statements" are typed by West, dated incorrectly or not at all, and on blank computer paper. The two "statements" are the only places where Nzekwe and Casulla implicitly confirm West's false story, in contrast to observers' reports of the incident, Nzekwe's own documentation, and Casulla's testimony at trial that Nzekwe was at fault. (*See* Defs.' Ex. G at 2, 6, 10; Tr. at 209-15.) Further, King submitted two statements, both dated July 10, 2017, which are almost identical, except for an additional paragraph on the second statement stating, "[Plaintiff's] employment is being terminated." (Def.'s Ex. B (King's Second Report) at 10.) As of July 10, 2017, Plaintiff had only been given a final warning. These irregularities in Defendant's critical paperwork serve to obfuscate what the Court concludes from all the evidence was Defendant's intention to terminate Plaintiff's employment at the earliest possible opportunity.

uncontroverted independent evidence that no discrimination had occurred." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (quoting *Reeves*, 530 U.S. at 148). However, in this case, the evidence at trial showed no other non-discriminatory reason for Plaintiff's termination, Plaintiff proved Defendant's proffered non-discriminatory reason to have been knowingly false, and strong circumstantial evidence of Defendant's discriminatory motivation to rid itself of what looked like a now-problematic employee since her son was injured. The Court also examines other factors including the temporal proximity between Defendant's learning of Plaintiff's disabled son and its termination decision, *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 337 (7th Cir. 2012); events preceding the plaintiff's discharge, *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009); differential treatment of similarly situated coworkers outside the ADA protected class, *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); *see also Zimmermann*, 251 F.3d at 382; and disparaging comments by supervisors, *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992) ("Conduct or statements by persons involved in the decisionmaking process [] may be viewed as directly reflecting the alleged discriminatory attitude.").

### i. Sequence of preceding events

The events leading to Plaintiff's termination occurred in quick succession, particularly given that Plaintiff only worked two or three days a week at Advanced.[8] Three days after her son's surgery, in early May, West's question suggested her concern that Plaintiff's son's new disability could interfere with her job performance. (Tr. at 45.) Less than two months later, in early July 2017, when Plaintiff's son was due to be released from the hospital leaving Plaintiff primarily responsible for his care,[9] West took Plaintiff off the

---

[8] Plaintiff testified that she worked only 16 hours a week. (Tr. at 46.)

[9] At trial, Plaintiff stated that her son was at Gaylord Hospital for rehabilitation for "[a]bout a month and two weeks." (*Id.* at 25.)  Plaintiff's son's medical records indicate that he was admitted to Gaylord Hospital on May 17, 2017, making his release date somewhere in the last week of June or first week of July. (Pl.'s Ex. 5 at 1.)

schedule for failing to renew her license, despite being aware of Plaintiff's need to use the regulatory grace period to adapt to her son's needs.[10] (*Id.* at 255.) One week after her son was released from the rehabilitation hospital, on July 10th, Plaintiff was suspended when she brought her son to work, and, despite having no prior disciplinary incidents, was told by her supervisor that this was a "final" warning and "one more incident would result in her termination." (*Id.* at 289.) Three weeks after returning to work following the suspension, Plaintiff was fired. In the three-and-a-half months after her son's accident and within six weeks of her assuming responsibility for his care, Plaintiff went from being an "average" or "above average" LPN at Advanced to being suspended and fired.

### ii. Differential treatment

Plaintiff was fired for what West and others knew was Nzekwe's deficient conduct. Instead, Nzekwe received no rebuke. After the incident with the fallen patient, West took a statement from Nzekwe but declined even to speak with Plaintiff, instead firing her over voicemail just one day after learning of the incident and refusing to meet with Plaintiff and her union delegate about getting her job back. If it had been West's intention to look decisive and resolute about patient well-being by taking swift and strong action against a charge nurse who broke protocol, she would have disciplined Nzekwe. Instead, only Plaintiff was singled out and disciplined harshly.

The incident with the patient was the last of several instances of differential treatment of Plaintiff by Defendant's administrators. When Plaintiff brought her son to work because his care had temporarily fallen through, she was told that she could not stay if he was there and was instructed to leave immediately. Yet, by West's own admission, Advanced

---

[10] At trial, West told two stories, claiming at first that "Ms. Carmichael did not indicate to me she needed more time to renew her license," but then was impeached by her deposition testimony where she admitted that she "recall[ed] Ms. Carmichael telling [her] that she was in the hospital with her son and that she had not renewed her license yet and she was going to get to it as soon as possible." (Tr. at 287-88.)

had "knowingly permitted the staff to bring their children in the event of an emergency where they could not leave them home unattended." (*Id.* at 259.) Plaintiff recalled several instances she knew of when other nurses had brought their children in. She was not advised of any prohibition in response to her earlier inquiry, which was consistent with a supervisor's benign reaction to her son's presence in the facility. However, in contrast, King testified there was a policy against having children at work and Plaintiff and her son were shown the door. While other nurses had been afforded the state-sanctioned grace period for licensure renewal, Plaintiff was immediately taken off the schedule for two days for failing to renew the license by her birthday, even though she had informed her supervisor of her need for extra time after her son had become disabled.

      *iii. Disparaging comments*

      King admitted that she suspended Plaintiff in part because "there was a boy there [who] would distract her from passing medications and not making any mistakes and watching the residents," (*Id.* at 134), yet also admitted that the boy was not actually distracting anyone, but simply "sitting in a resident room playing on a game (unoccupied)," (Def.'s Ex. B. (King's Report) at 8). When King called the impromptu meeting in the back room, leaving Plaintiff's son's unattended on the resident's floor, she called in two other supervisors and a union delegate as witnesses. She instructed Plaintiff to "count with one of the supervisors and leave with your child," (Tr. at 123). She claimed that the union delegate told Plaintiff there was a policy against bringing children to work, even though no such policy existed.[11] At this meeting, the tenor of Defendant's administrator's negative attitude about

---

[11] *Compare* King's Report ("She was informed by the delegate that no one is to bring their children to work") *with* Tr. at 134 (admitting that "we did not have a formal policy" about staff bringing children onto the resident units); *compare also* Def.'s Ex. B at 12-13 (union delegate's report that Carmichael had "spoken to the ADNA relating the taking her son to work . . . [and] was told that she would have enquire [sic] about a volunteer programe but she have [sic] not heard back from her since. Charge nurse was again told by Administrator that her son cannot be *in the facility*." (emphasis added) *with* Tr. at 308 (West's testimony

Plaintiff's son was reflected in Assistant Director of Nursing Michelle Morse's unrebuked hostile shouting, "We all know about your situation, Deborah, we all know about your son," (*Id.* at 67, 154).[12]

Despite King's and West's assurances at trial that Plaintiff's first suspension was unrelated to her son, the reports by the union delegate and the supervisors called to participate in the meeting emphasize that the meeting *was* about the son. Although King insisted that Plaintiff's suspension was due to her failure to close the medication room door and inappropriate administration of medication, none of the impartial observers mentioned either of those justifications in their reports of the incident. Notably, neither King, West, nor Plaintiff could recall if anyone actually closed the medication room door after the altercation between King and Plaintiff began. Based on the comments by administrators and observations by other staff, it is clear that Plaintiff's suspension and "final warning" reflected Defendant's unsubstantiated concerns about the effect Plaintiff's son may have on her workplace performance. Once Plaintiff was placed on "final warning" for bringing her son to work, despite there being no policy to the contrary, Advanced felt free to move to the termination stage promptly, which it did.

Considering the totality of circumstances, including the false reason for Plaintiff's firing, the temporal proximity of her son's accident and her termination, the administrator's ruckus in reaction to the son's presence at work, the disparate treatment of Plaintiff, and the disparaging comments made by administrators, the Court concludes that Plaintiff has shown

---

that "[i]n the event of a weather situation, [] we allowed our staff to bring their children if they chose to [remain in] our main dining room").

[12] The language by Morse is analogous to that used by administrators in *Kelleher*, where the Second Circuit found statements "that the defendant's 'problems at home were not the company's problems'" to be indicative of discriminatory intent. *Kelleher*, 939 F.3d at 470; *see also Ostrowski v. Atl. Mut. Ins. Companies*, 968 F.2d 171, 182 (2d Cir. 1992) (noting that "[c]onduct or statements by persons involved in the decisionmaking process [] may be viewed as directly reflecting the alleged discriminatory attitude").

by a preponderance of the evidence that a determinative reason for Plaintiff's termination was Defendant's intentional associational disability discrimination.

### c.  Damages

#### i.  Economic loss

Plaintiff's economic damages are calculated by using Plaintiff's average weekly gross pay of $733.52.  Her lost wages from the time of her firing in the last week of August 2017 to the end of that year (18 weeks) total $13,203.36. For 2018, if she had continued at Advanced, she would have earned $38,143.02, from which her interior earnings at the Willows of $25,379 are subtracted, netting a $12,764.02 loss for 2018. In 2019, Plaintiff earned $35,902 at the Willows and the difference between that amount and her expected income from Advanced is $2,241.02 in lost wages. Thus, Plaintiff suffered an economic loss of $28,198.30 from when she was fired in August 2017 until the end of 2019, when she filed this suit. *See Tse v. New York Univ.*, 190 F. Supp. 3d 366, 371 (S.D.N.Y. 2016) (recognizing that the ADA provides for the same remedial schemes as Title VII); *Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr.*, 652 F.3d 277, 286 (2d Cir. 2011) (holding that "[a]n award of backpay is the rule, not the exception" for Title VII claims).

#### ii.  Non-economic damages

In formulating a reasonable compensatory damages award for Plaintiff's unlawful termination where the nature of the injury is detailed only by Plaintiff, without medical or other witness corroboration, the Court considers the length of suffering, the nature of the emotional distress, physical manifestations, and any particularly complex or difficult circumstances faced by the Plaintiff.  *See Duarte v. St. Barnabas Hosp.,* 341 F. Supp. 3d 306 (S.D.N.Y. 2018); *Johnson v. Strive E. Harlem Employment Grp.*, 990 F. Supp. 2d 435 (S.D.N.Y. 2014); *Presumey v. Town of Greenwich Bd. of Educ.*, No. 3:15CV278 (DFM), 2018 WL 2694442 (D. Conn. June 5, 2018).

At trial, Carmichael described the emotional impact of Advanced's discriminatory treatment:

> How much more can I absolutely carry, you know. I already have a child that's disabled. [] Now I've got to worry about having a disabled child and not having income. [] That's a whole nother [sic] issue. Then I got to make sure I keep a roof over our head.  You know, it's -- all of those things become -- it makes you upset. . . . [I] definitely [suffered from] a lot of mental and emotional stress.  I cried a lot.  I did a lot of crying.  I was very, very upset, angry. It was hard to eat. I even had to go and speak to someone because sleeping became impossible. . . . I couldn't unwind at night, couldn't rest because you get anxious[.] Things start piling up, the bills pile up, the kid is sick. [] And when you're single and you don't have anyone to kind of balance that, you carry that whole load and then you've got to keep that in all day because you don't want your child to see you stressing.

(Tr. at 85-86.) She described that Advanced treated her "[a]s worst as they possibly could[,] . . . like I hadn't been a valued employee. [I] was just like dust on a dustpan to them[.] It was really hurtful." (*Id.* at 86-87.) Plaintiff's testimony credibly demonstrates serious emotional distress and anxiety resulting from her sudden and unjust termination shortly after her son was discharged from the hospital with a traumatic brain injury. While she offered no medical or witness corroboration, she reported physical manifestations resulting from her emotional distress in the form of loss of appetite and sleeplessness. Her conditions were apparently sufficiently serious to her that she sought some counseling from a therapist. (*Id.* at 87.) She was without employment income for ten months, but nonetheless had to find ways to support her newly-disabled son. Considering the extreme circumstances under which Advanced terminated Plaintiff, the Court concludes that fair and reasonable compensation for her emotional injuries and associated physical impacts is $70,000.[13]

---

[13] This is consistent with other comparable cases in this Circuit where compensatory damages awards range between $30,000 and $125,000. *See Duarte,* 341 F. Supp. 3d at 323 (awarding $125,000 of compensatory damages because the plaintiff suffered from anxiety and sleeplessness for five years, and headaches, stomach aches, and a loss of self-esteem for three years); *Johnson*, 990 F. Supp. 2d at 457 (awarding $80,000 of compensatory damages, where the plaintiff's testimony of her stress and anxiety did not include any physical manifestations of her distress); *Presumey*, 2018 WL 2694442, at *5, *6 (awarding $75,000 in compensatory damages in part because the plaintiff "was a single parent with a

**IV.      Conclusion**

Accordingly, based on the foregoing findings, judgment in the total amount of $98,208.44 will be entered in favor of Plaintiff Deborah Carmichael, comprised of economic damages of $28,208.44 and $70,000 for noneconomic compensatory damages. Judgment shall be entered by the Clerk.


IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 24th day of February, 2021.

---

minor child" who, as a result of her discriminatory job loss one year after becoming disabled, "suffered great anguish about providing for her child").